**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0660n.06
Filed: September 5, 2007

**No. 06-1995**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| WILLIAM PREYOR, JR., as Personal Rep. of the Estate of WILLIAM PREYOR, III, Deceased, | ) ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| CITY OF FERNDALE et al., | ) | |
| Defendants-Appellants. | | |

Before:     KEITH, MOORE, and COLE, Circuit Judges.

KEITH, Circuit Judge. On behalf of his son (William Preyor, III), Plaintiff William Preyor Jr. brought this 42 U.S.C. § 1983 action against the City of Ferndale and several of its police officers, alleging deliberate indifference to his son's serious medical needs. The parties stipulated to the dismissal of all Defendants except two (Sergeants Steve Jennings and Thomas Cupples). These two collectively filed a motion for summary judgment on the basis of qualified immunity, which the district court denied. They filed this interlocutory appeal; and, for the following reasons, we **AFFIRM** the district court's denial of qualified immunity.

**I. BACKGROUND**

Around 12:47 p.m. on September 20, 2002, William Preyor, III was arrested for possession of a stolen vehicle and taken to the Ferndale Police Department to be booked. Less than twenty hours later, Preyor was found dead in his cell. The events leading to his death are as follows:

**12:47 p.m.—5:00 p.m.:  Sergeant Jennings' First Shift**

Upon arriving at the Ferndale Police Department, Preyor gave the in-take officer (David Watters) the alias "Derrick Hayden."  Officer Watters booked Preyor under this alias, but, when Preyor's true identity was discovered through fingerprint identification (about an hour or so later), Preyor's booking forms were changed to reflect this.

Preyor's "Arrest and Confinement" form indicated that Preyor informed Officer Watters that he was a diabetic and "on meds."   Preyor also informed the supervisor of the day shift (Sergeant Steve Jennings) that, as a diabetic, he required a shot of insulin twice a day and that he had not yet taken his medication for that day.  Jennings instructed another officer to call CVS Pharmacy to check on Preyor's claims, but, according to Jennings,  Preyor's true identity was still unknown at that time.  And, hence, CVS indicated that it had no "Derrick Hayden" in its system.  (Plaintiff has proffered evidence showing that, at this point, officers had already discovered Preyor's true identity.)

At approximately 2:01 p.m., Jennings contacted Ferndale Fire Department's Paramedics Steven Light and Dennis Barr.  After the paramedics arrived at the jail, they checked Preyor's vitals and blood sugar level.  Tests indicted that Preyor's blood sugar level was elevated, but Preyor was given no treatment.  The paramedics told Sergeant Jennings that they could not confirm whether Preyor was taking insulin.  They then advised Jennings to continue to monitor Preyor's behavior and to call them back if necessary.  (JA 150) (Jennings' Dep. 25).   At approximately 2:28 p.m., the paramedics left the station without treating Preyor.  He was placed in a "bullpen" cell in the meantime.

**3:00 p.m.—11:00 p.m.:  Lieutenant Czajkowski's Shift**

At approximately 5:20 p.m., and, again, at 5:40 p.m., Preyor was observed "curled up" and trembling in the corner of the bullpen cell.  The supervisor of the afternoon shift (Lieutenant B. Czajkowski) immediately called for an ambulance.  Paramedics arrived approximately six minutes later (at approximately 5:46 p.m.).   Preyor's blood sugar level was again found to be elevated—although slightly less than it had been earlier.  The paramedics (Jack Pesha and Dennis Barr) contacted St. John's Oakland Hospital and spoke with a doctor, who allegedly informed them that it was unnecessary to hospitalize Preyor.  Lieutenant Czajkowski signed a "no transfer" form and told paramedics that the officers would try to obtain Preyor's medication.   Preyor was then placed back into the bullpen.

**11:00 p.m.—7:00 a.m.:  Sergeant Cupples' Shift**

At approximately 3:05 a.m. the next morning (September 21, 2002), Preyor was again observed on the floor of the bullpen.  Preyor stated that he was experiencing "DT's" (which the supervisor of the midnight shift, Sergeant Thomas Cupples, interpreted to mean "detoxification" (JA 210)) and that he did not feel well.  Sergeant Cupples was told of Preyor's complaints and of the paramedics' earlier visits, but he did not take any action at this point.

Around 5:30 a.m., after Sergeant Cupples was again informed that Preyor believed that he was detoxing from heroin and made threats to hang himself, Sergeant Cupples ordered that Preyor be transferred to the observation cell (or the "fish bowl") to allow officers to monitor his behavior. When Preyor realized that he was being transferred to the fish bowl, he pleaded, "Hey man, I'm not going to hurt myself, I just want some attention." (JA 398.)

Within minutes of being transferred into the fish bowl (at 5:45 a.m.), Preyor begged officers to be transferred back into a cell with a toilet, as "[he] need[ed] to use the bathroom every five minutes" due to his detoxification. (JA 401.) The officers relayed this information to Sergeant Cupples, who then instructed an officer to take Preyor to a cell with a toilet so that he could use it. Preyor was then transferred back to the fish bowl.

Again, within minutes of returning to the fish bowl (at 6:00 a.m.), Preyor requested to use the restroom. Preyor was taken to another cell to use the restroom, and, as Preyor was being transferred back into the fish bowl, he informed the escorting officer that he was suffering from heroin withdrawal. At 6:20 a.m. (twenty minutes had passed from his last visit to the restroom), Preyor again asked an officer to use the restroom. Preyor was again taken to a cell to use the restroom. After using the restroom, Preyor attempted to lay down on a bed in the cell, but he was transferred back to the fish bowl. At this point, Preyor had used the restroom a total of three times after being transferred into the fish bowl and making complaints about suffering from diarrhea. (Sergeant Cupples contends that he only had knowledge of two of these three times. (JA 211.))

Around 6:40 a.m., a few officers, including Sergeant Cupples, observed Preyor vomiting in the fish bowl—two to three times. According to one officer, Preyor had vomited a "large amount of green vomit on the floor." (JA 408.) (Sergeant Cupples contends that Preyor had been sticking his finger down his throat to induce the vomit.)

At 6:45 a.m., Sergeant Jennings returned to the station to begin his day shift. Sergeant Cupples briefed Sergeant Jennings about Preyor's condition. Before leaving his shift, around 7:10 a.m., Sergeant Cupples noticed Preyor on the floor of the fish bowl.

**7:00 a.m.—7:50 a.m.: Sergeant Jennings' Second Shift**

Preyor asked Sergeant Jennings to use the restroom. Another officer (as instructed by Jennings) took Preyor to another cell to use the restroom and then transferred him back to the fish bowl. At 7:35 a.m., Preyor was allowed to use the restroom again. He informed the escorting officer that he was suffering from diarrhea because he was detoxing from heroin. After the escorting officer informed Sergeant Jennings of Preyor's claims, Sergeant Jennings instructed the officer to leave Preyor in the bullpen cell, where there was a toilet.

At 7:50 a.m., Sergeant Jennings attempted to move Preyor back into the fish bowl, but Preyor was lying on the floor and unresponsive. Sergeant Jennings instructed an officer to call the Ferndale Fire Department, while Jennings unsuccessfully performed CPR on Preyor. Paramedics were also unsuccessful in reviving Preyor, and he was pronounced dead at 8:37 a.m.

An autopsy revealed that the "cause of death" was due to "drug abuse and complications," but it did not determine the "manner of death." (JA 437) (Autopsy Protocol). The doctor who performed the autopsy (Dr. Ljubisa Jovan Dragovic) later testified in his deposition that vomiting and diarrhea can be signs of heroin withdrawal. (JA 452). Dr. Dragovic concluded that "[Preyor] went into withdrawal, and as a result of that died." (JA 452.).

A forensic pathologist (Dr. Werner U. Spitz) reviewed Preyor's case, and determined that "Preyor died as a result of electrolyte imbalance due to dehydration caused by diarrhea and vomiting." (JA 469) (Spitz's Report). Dr. Spitz also opined, "I do not believe that Mr. Preyor's diabetes played a significant role in causing his death. However, diarrhea is a known complication of opiate withdrawal, thus abstinence from heroin causing fluid loss by way of diarrhea and vomiting would have been directly implicated in causing the demise." (JA 469.) According to Dr. Spitz, "[a]dminstration of fluids at anytime during the night and treatment for diarrhea and vomiting would

have been lifesaving." (JA 470.)

On December 24, 2004, William Preyor Jr. (Preyor's father and personal representative of his estate) filed this § 1983 action against the City of Ferndale and several of its employees, including Sergeants Jennings and Cupples, alleging deliberate indifference to his son's serious medical needs.  On March 16, 2006, Defendants collectively filed a motion for summary judgment on the basis of qualified immunity.  Plaintiff stipulated to the dismissal of all Defendants except Segreants Jennings and Cupples.   At a June 28, 2006 hearing, the district court denied Sergeants Jennings and Cupples' motion without a written opinion.  Jennings and Cupples timely filed this interlocutory appeal.

## II. ANALYSIS

### A.  Jurisdiction

The first issue on appeal is whether we have jurisdiction.  As a general matter, our Court has jurisdiction to review "final orders" under 28 U.S.C. § 1291.  "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291, notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  However, "[t]o the extent that a denial of summary judgment finding qualified immunity inappropriate is based upon the district court's determination that a genuine issue of material fact exists, the decision will not be immediately appealable." *Crockett v. Cumberland College*, 316 F.3d 571, 578 (6th Cir. 2003).   Therefore, "if what is at issue in the appeal is nothing more than whether the evidence could support a finding that particular conduct occurred, there is no appellate jurisdiction because that question is inseparable from the merits of

the plaintiff's claim." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (internal quotation marks omitted); *Johnson v. Jones,* 515 U.S. 304, 319 (1995).

The district court's denial of Defendants' motion was based on its determination that "genuine issues of material fact" remain as to whether Defendants were deliberately indifferent to Preyor's serious medical needs.   However,"[t]he district court's assertion that there are genuine issues of material fact does not, standing alone, destroy the appealability of a qualified immunity ruling." *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997); *see also Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995) ("A defendant's right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order . . . ."). If a defendant concedes (for the purposes of appeal) "the best view of the facts to the plaintiff[,]" *Berryman*, 150 F.3d at 564*,* the Court has jurisdiction to determine the remaining legal question of qualified immunity:  "whether the facts as alleged by [plaintiff] demonstrate a violation of a clearly established constitutional right," *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (finding jurisdiction because plaintiff "[did] not raise the issue of [fact contested in the district court]"); *Comstock v. McCrary,* 273 F.3d 693, 701 (6th Cir. 2001) (finding jurisdiction "[a]lthough factual issues were contested before the district court [because,] for the purposes of [the] appeal, both parties ha[d] explicitly stipulated to plaintiff's version of facts").

Although Defendants have contested factual issues in their appellate briefs, they purported to correct their position at oral argument and conceded "the best view of the facts to the Plaintiff[.]" *Berryman*, 150 F.3d at 564. To the extent that the substance of their arguments reveal that they are essentially contesting Plaintiff's version of the facts, we ignore these attempts and address only the purely legal issues. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005).

Therefore, "[b]ecause the case before us turns on whether Plaintiff's facts, admitted by Defendants for purposes of this appeal, show a violation of clearly established law, not on which facts the parties may be able to prove, the district court's denial of qualified immunity is a 'final order' under 28 U.S.C. § 1291, and we have jurisdiction to decide the case on merits." *Williams v. Mehra*, 186 F. 3d 685, 690 (6th Cir. 1999) (en banc) (internal quotation marks, citations, and alterations omitted).

### B.  Qualified Immunity

Our review of the district court's denial of summary judgment on the basis of qualified immunity is *de novo*.  *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003).

"Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Champion v. Outlook Nashville, Inc.*, 380 F. 3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether a defendant is entitled to qualified immunity, the threshold question is:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Provided the answer is "yes," "the next, sequential step is to ask whether the right was clearly established." *Id.*   We consider each question in turn.

#### 1.  Constitutional Violation

Plaintiff contends that "Defendants Sgt. Jennings and Cupples were deliberately indifferent to Mr. Preyor's serious medical needs."  (Appellee's Br. 14.)   While the Eighth Amendment generally provides the legal basis to assert a claim of deliberate indifference to serious medical needs,  where that claim is asserted by (or, as here, on behalf of) a pre-trial detainee,  the Due Process

Clause of the Fourteenth Amendment is the proper starting point. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001). For our purposes, however, the distinction is without a difference because, under either Amendment,"[t]he test to determine whether [a defendant] acted with 'deliberate indifference' has an objective and subjective component." *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

"The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). Whereas the subjective component requires a plaintiff to show that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety, which is to say the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal quotation marks omitted). Officials, of course, do not readily admit this subjective component, so "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Comstock*, 273 F.3d at 703.

With these general principles in mind, we examine the merits of Plaintiff's case.

### a. Objective Component: Sufficiently Serious Medical Need

In a light most favorable to Plaintiff, the facts show that Preyor was a diabetic in need of periodic shots of insulin and that he had exhibited signs of detoxing from an heroin addiction. On more than one occasion, Preyor vomited a "large amount of green vomit on the floor," which was "a clear manifestation of [an] internal physical disorder," *Blackmore*, 390 F. 3d at 899. On more than one occasion, he complained of and suffered bouts of diarrhea, eventually causing him to

dehydrate.  On more than one occasion, he was seen lying on the floor of a cell or in the fish bowl.

*Cf.  Estate of Carter*, 408 F.3d at 312.   And, on more than one occasion, Preyor told Officers that he did not feel well and that he believed he was detoxing from heroin.

Given these facts (which are viewed in Plaintiff's favor), we find it incontrovertible that these symptoms show anything but a sufficiently "serious medical condition," which was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F. 3d at 899–900 (quoting *Gaudreault v. Municipality of Salem*, 923 F. 2d 203, 208 (1st Cir. 1990)); *cf. Clark-Murphy*, 439 F.3d at 286–87 (noting that "the deprivation of water and medical care . . . of course would be 'sufficiently serious' to satisfy [the objective component requirement]"). Therefore, the objective component of the deliberate indifference standard has been satisfied.

**b.  Subjective Component:  Sufficiently Culpable State of Mind**

The next issues are (1) whether the facts in a light most favorable to Plaintiff show that Sergeants Jennings and Cupples had subjective knowledge of Preyor's serious need for medical attention; and, provided they did, (2) whether Sergeants Jennings and Cupples disregarded that need.

With respect to Defendants' subjective knowledge, Defendants argued that the facts do not show that they had subjective knowledge of Preyor's serious medical needs.  However, "our review is made difficult by the district court's failure to make findings of fact for this court to assume as true."   *Comstock*, 273 F.3d at 701 n.3.  As such, the Supreme Court has said that we "may . . . undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." *Johnson,* 515 U.S. at 319.

With respect to Sergeant Cupples' subjective knowledge, the facts, in a light most favorable to Plaintiff, show that (1) when Sergeant Cupples arrived for his shift, he was briefed on Preyor's

condition; (2) Sergeant Cupples was informed that paramedics had been summoned to the station on two occasions; (3) Sergeant Cupples later observed Preyor vomiting green vomit in the fish bowl; (4) Sergeant Cupples had knowledge that Preyor had frequent bouts of diarrhea; (5) Sergeant Cupples was informed that Preyor claimed that he was detoxing from heroin; (6) Sergeant Cupples permitted Preyor use of the restroom on several occasions throughout his shift; and (7) before leaving work, Sergeant Cupples noticed Preyor lying down on the floor of the fish bowl.

Likewise, with respect to Sergeant Jennings' subjective knowledge, the facts, in a light most favorable to Plaintiff, show that (1) upon arriving at the station, Preyor informed Sergeant Jennings that he was a diabetic and required insulin shots;[1] (2) paramedics were called during Jennings' shift, but no treatment was given to Preyor; (3) paramedics advised Sergeant Jennings to keep a close watch on Preyor's condition and to call them back if necessary; (4) when Sergeant Jennings arrived for his second shift, Sergeant Cupples briefed Sergeant Jennings on Preyor's condition; (5) Sergeant Jennings testified that he received training as a "first responder" and was taught "to recognize people in serious medical distress which can include drug use [and other] medical conditions [including

---

[1] Sergeant Jennings argues that his "conduct relating to Preyor's diabetes cannot support Plaintiff's § 1983 claim" because "the cause of Preyor's death was 'drug abuse and complications,' *not* diabetes." (Appellants' Reply Br. 1-3.) We reject Jennings' argument for a couple reasons. First, Plaintiff "need only demonstrate a link between each defendant's misconduct and [Preyor's] *injury*, which may include his death as well as the 'pain and suffering' that preceded his death." *Clark-Murphy*, 439 F.3d at 293 (internal citation omitted).

Second, despite Jennings' contention, the facts in a light most favorable to Plaintiff show that a reasonable jury could conclude that the diabetes played *some* part in Preyor's death, even if not a major part. The autopsy report, for example, concluded that the cause of death was due to "drug abuse and *complications*"—complications which are unknown at this stage in the case. (JA 437.) It is true that one of Plaintiff's experts opined that he did not "believe that Mr. Preyor's diabetes played a *significant* role in causing his death." (JA 469). Notably, however, the expert did not conclude that Preyor's diabetes played *no* role in his death.

diabetes]" (JA 149) (Jennings' Dep. 23); (6) an officer informed Sergeant Jennings that Preyor claimed "he was detoxing from heroin and also that . . . he was having bad diarrhea" but Jennings instructed the officer "to leave Preyor in the bullpen" (JA 292); and (7) Sergeant Jennings permitted Preyor use of the restroom a couple of times during his morning shift. Because "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[,]" *Farmer*, 511 U.S. at 842, we conclude that these facts taken together and in a light most favorable to Plaintiff support a reasonable inference that both Sergeants Cupples and Jennings possessed subjective knowledge that Preyor was detoxing from heroin.

Nonetheless, "officials who actually knew of a substantial risk to [a detainee's] health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Here, the facts in a light most favorable to Plaintiff demonstrate that Defendants did not reasonably respond to the risks to Preyor's health. Although the paramedics were called the day before during Sergeant Jennings' first shift (after Preyor indicated that he was a diabetic) and Lieutenant Czajkowski's shift (who recognized the need for medical attention after observing Preyor "curled up" and "trembling" in the corner of a cell), neither Sergeant Cupples nor Sergeant Jennings summoned paramedics the morning of Preyor's death (until, of course, after he was dead), despite signs that his condition had significantly worsened since paramedics were last summoned. *Cf. Miller v. Calhoun County*, 408 F.3d 803, 823 (6th Cir. 2005) (affirming grant of qualified immunity where, among other things, "[decedent's] condition neither worsened nor improved throughout the night").

Defendants suggest that, because they permitted Preyor to use the restroom throughout the night and morning, they did not "disregard" his condition. However, Plaintiff is not required to

show that Preyor was "literally ignored." *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)

(quoting *Sherrod v. Lingle*, 223 F. 3d 605, 611–12 (7th Cir. 2000)). As the Seventh Circuit said in

*Sherrod*, "If knowing that a patient faces a serious risk of appendicitis, [a] prison official gives the

patient an aspirin and an enema and sends him back to his cell, a jury could find deliberate

indifference although the prisoner was not 'simply ignored.' The question mandated by *Farmer* is

whether the official knew of and disregarded an excessive risk to the inmate's health, not whether

the inmate was ignored." 223 F.3d at 611–12. Therefore, if Sergeants Cupples and Jennings knew

that Preyor was detoxing from heroin (as we have concluded herein), then a reasonable jury could

find that simply granting Preyor opportunities to relieve himself would amount to a disregard of his

condition.

Accordingly, on the basis of these facts (taken in Plaintiff's favor), we conclude that both

Sergeants Jennings and Cupples "subjectively perceived facts from which to infer substantial risk

to [Preyor's health], that [they] did in fact draw the inference, and that [they] then disregarded that

risk." *Comstock*, 273 F.3d at 703.

**2. Clearly Established Right**

Next, we determine whether the law was "clearly established" at the time of Preyor's death.

*See Mitchell*, 472 U.S. at 530; *Johnson*, 515 U.S. at 313. We conclude that it was.

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right.'" *Feathers v.*

*Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F. 2d 1036, 1042

(6th Cir. 1992)) (alteration in original). And, "[a]lthough it need not be the case that the very action

in question has been previously held unlawful, . . . in the light of pre-existing law the unlawfulness

must be apparent." *Id.* (internal quotation marks omitted) (second alteration in original).

At the time of the incident, the law was clearly established that Preyor was entitled to medical attention under the Fourteenth Amendment. In *Estate of Carter*, we recognized that "[a]s early as 1972, this court stated 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)); *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) ("[T]he Fourteenth Amendment right of pretrial detainees to adequate medical care is, and has long been, clearly established."); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976) ("[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." (quotation marks omitted)). To make this right absolutely apparent, "in 1992, this court explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Estate of Carter*, 408 F.3d at 313 (citing *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992)). Therefore, Preyor's constitutional right to medical treatment was "clearly established" at the time of his death.

Accordingly, because the facts in a light most favorable to Plaintiff show that Defendants were deliberately indifferent to Preyor's constitutional right to receive treatment for a serious medical need, and because that right was clearly established at the time of Preyor's death, we conclude that Defendants are not entitled to qualified immunity.

## III. CONCLUSION

Accordingly, and for the reasons stated above, we **AFFIRM** the district court's denial of summary judgment on the basis of qualified immunity.