RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JOHN E. GRISWOLD,

                    *Plaintiff-Appellee*,

    *v.*

TRINITY HEALTH MICHIGAN, dba St. Joseph Mercy Livingston,

                    *Defendant*,

TERRY DAVIS, Sergeant; TRAVIS LINDEN, Deputy, PATRICK TURCHI, Deputy; ALLISON SCHULTE, Deputy; ERIC VANVLEET, Deputy; KURT HEIOB, Deputy, VINCENT JOHN, Deputy,

                    *Defendants-Appellants*.

No. 25-1271

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10980—Robert Jerome White, District Judge.

Argued:  April 30, 2026

Decided and Filed:  May 11, 2026

Before: GIBBONS, THAPAR, and LARSEN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Kali M. L. Henderson, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellants.  Beth A. Wittmann, GRANZOTTO & WITTMANN, P.C., Berkley, Michigan, for Appellee.  **ON BRIEF:**  Kali M. L. Henderson, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for Appellants.  Beth A. Wittmann, Mark Granzotto, GRANZOTTO & WITTMANN, P.C., Berkley, Michigan, for Appellee.

_____

**OPINION**

_____

LARSEN, Circuit Judge.  In 2018, law enforcement officers arrested John Griswold after a domestic disturbance.  He admitted to taking several pills that were later identified as ulcer medication.  After being medically cleared by doctors and discharged from the hospital, the officers placed Griswold in a jail cell.  He died several hours later.  Griswold's estate sued several jail officials alleging deliberate indifference in violation of his constitutional rights.  The district court denied qualified immunity to some of the officials, who now appeal.  Because the officials are entitled to qualified immunity, we REVERSE.

I.

In this interlocutory appeal from the denial of qualified immunity, "[a] settled evidentiary hierarchy governs the factual landscape . . . ." *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 601 (6th Cir. 2025).  "We start with the available [video] footage, which largely captures the incident in question and leaves few facts in dispute." *Id.*  "For those moments where the footage does not aid our understanding, we fill in the blanks by considering disputed evidence in a light most favorable to [Griswold], completing the story with any uncontested factual assertions the [defendants] proffer." *Id.*

In October 2018, police from Brighton, Michigan, arrested John Griswold following a domestic disturbance.  Officers at the scene found Griswold in the kitchen of a home and saw "a large amount of pills sitting on the kitchen counter."  R. 77-2, Police Report, PageID 3288.  Griswold admitted to taking about ten pills but did not know what the pills were for.  Paramedics concluded that the pills were ulcer medication.

Officers transported Griswold to the Livingston County jail.  Upon arrival, a nurse determined that Griswold "needed to be transported to the emergency room for clearance" into the jail.  R. 77-3, Progress Notes, PageID 3292.  Griswold was "sweaty," "ha[d] pin point pupils," and would not answer questions about his health.  *Id.*  Officers transported Griswold to the hospital.  Shortly after 3 p.m., a doctor noted "[p]robable intoxication likely from drug" but

found that Griswold was not in distress, denied having any pain, and was "following commands" and "speaking in full sentences." R. 77-4, Physician Note, PageID 3293. Doctors discharged Griswold around 5:45 p.m., diagnosing him with a nasal fracture, but finding him "stable" and medically clearing him for incarceration.

Griswold returned to the jail around 6 p.m. He had difficulties getting out of the police vehicle and stumbled slightly while entering the intake vestibule. This is when Griswold first interacted with Deputies Travis Linden and Patrick Turchi. The deputies received the hospital discharge paperwork, which stated, "[a]ltered mental state; [a]mphetamine user; [m]edical clearance for incarceration; nasal fracture." R. 53-11, Discharge Paperwork, PageID 867. The paperwork also instructed Griswold to return to the hospital for "[s]ignificant changes or worsening in [his] condition" or for "recurrent vomiting." *Id.* at 873, 876. During intake, Griswold stood against the wall and refused to respond to commands. Eventually, police handcuffed Griswold, escorted him to a cell, and sat him down, still handcuffed, with assistance.

About thirty minutes after Griswold was placed in the cell, Sergeant Terry Davis entered the cell to speak with him. Griswold looked at Sergeant Davis but did not verbally respond. Roughly 25 minutes later, Deputies Linden and Turchi entered the cell to remove Griswold's handcuffs. After doing so, they helped Griswold, who appeared lethargic and had difficulties standing, to a seated position on the ground. He remained seated in that position against the wall, largely with his arms crossed and his legs stretched out, occasionally moving his arms, legs, and head. Deputy Allison Schulte checked on him half an hour later, at around 7:30 p.m.

Around 8 p.m., Griswold turned his head, raised his hand to his mouth, and vomited what appears to be mostly liquid to his left. He touched his nose and mouth area and returned to his prior sitting position with his arms crossed. Thirty seconds later, he wiped his nose and mouth area again and then recrossed his arms. He did not ask for help or move his body away from the vomit. Deputies Turchi and Linden conducted a cell check around 8:30 p.m.; they did not clean up the vomit or seek medical attention for Griswold. Deputies Turchi, Linden, and Schulte made numerous cell checks over the next 4 hours. During this time, Griswold largely remained in the same position but periodically adjusted his arms, bent his knees, or moved his legs.

From midnight to 4 a.m., these movements continued, while Deputies Schulte, Turchi, and Linden made routine cell checks.

Schulte, Linden, and Turchi continued the checks from 4 a.m. to 6 a.m. Sergeant Davis tried to speak with Griswold through the cell door at 4:30 a.m. but got no response. Deputies Eric VanVleet, Vincent John, and Kurt Heiob took over at 6 a.m., and shortly thereafter conducted a head count. Griswold remained in the same spot he had been in since arriving in the cell, although by this time he had adjusted his position so that he was closer to lying down, with his legs extended, but with his head and shoulders still elevated and propped against the wall. Griswold continued to move his arms, legs, and head. Around 7:40 a.m., deputies entered the cell and found Griswold "unresponsive and not breathing." R. 77-15, John Dep. Tr., PageID 3663. They checked his pulse and removed him from the cell to perform CPR. Paramedics responded to the report of a cardiac arrest, but Griswold was dead before their arrival. Paramedics noted that Griswold "had thick green colored vomit around his mouth and coming out of his nostrils." R. 77-16, EMS Report, PageID 3681. Griswold's cause of death was identified as "Sudden Cardiac Death." R. 77-17, Death Certificate, PageID 3682. It was later determined that Griswold had toxic levels of Trazodone (an antidepressant) in his blood at the time of his death.

Timothy Griswold, as representative of John Griswold's estate, brought suit under 42 U.S.C. § 1983 against two sets of defendants. Trinity Health Michigan, Emergency Physicians Medical Group, P.C., and William J. Kanitz, M.D., comprised the first set. They are not part of this appeal. Livingston County, Sheriff Michael Murphy, Sergeant Davis, and Deputies Linden, Turchi, Schulte, Christopher Marquette, VanVleet, David Loar, Heiob, Alicia Famie, and John comprised the second set (hereinafter, the County defendants). Griswold claimed that the County defendants were deliberately indifferent to his medical needs. The County defendants moved for summary judgment, with the individual defendants arguing for qualified immunity. The district court granted summary judgment to Sheriff Murphy and Deputies Marquette, Famie, and Loar. But it denied summary judgment to Livingston County, Sergeant Davis, and Deputies Heiob, John, VanVleet, Schulte, Turchi, and Linden.

The individual defendants to whom the district court denied summary judgment now appeal, arguing that the district court erred by denying them qualified immunity.

II.

We review de novo the district court's denial of summary judgment. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018). Summary judgment is appropriate when the movant shows that "'there is no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We also review the district court's denial of qualified immunity de novo. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (citation omitted). A qualified immunity analysis asks "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Harris v. Klare*, 902 F.3d 630, 637 (6th Cir. 2018) (citation modified). The court may grant qualified immunity on either basis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"While the Eighth Amendment's ban on 'cruel and unusual punishments' protects convicted prisoners, the Fourteenth Amendment's ban on 'depriv[ations]' of 'life' or 'liberty' 'without due process of law' protects pretrial detainees." *Hehrer v. County of Clinton*, 161 F.4th 955, 962 (6th Cir. 2025) (alteration in original) (quoting U.S. Const. amends. VIII, XIV, § 1). Griswold was a pretrial detainee at the time of the alleged constitutional violation.

"At one time, the distinction between pretrial detainees and convicted prisoners did not matter" for either prong of the qualified immunity analysis. *See id.* at 963. To establish a constitutional violation, both sets of plaintiffs had to establish the same subjective and objective elements set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Hehrer*, 161 F.4th at 963. "Objectively, they had to establish that they had serious medical needs." *Id.* (citation modified). "Subjectively, they had to establish that a defendant knew of the substantial risk of serious harm that arose from their serious medical needs." *Id.* (citation omitted). "And they had to show that

the defendant did not respond reasonably to the risk upon learning of it." *Id.* (citation modified). In 2021, however, "we adopted an easier-to-meet subjective element for pretrial detainees" alleging deliberate indifference under the Fourteenth Amendment. *Id.* (citing *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021)). However, our court sitting en banc has now decided to reconsider the standards governing Fourteenth Amendment claims. *See Poynter ex rel. Fernandez v. Bennett*, 169 F.4th 716, 2026 WL 686194, at *1 (6th Cir. Mar. 11, 2026) (en banc) (order).

Our decision to revisit those standards doesn't affect this case for two reasons. First, we can resolve this case at step two of the qualified immunity test, which requires Griswold to show that the defendants violated clearly established law at the time of the incident. *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 927 (6th Cir. 2024). Griswold's death occurred in 2018, when the *Farmer* test governed both convicted prisoners and pretrial detainees. *Id.* So "our older decisions applying *Farmer* to the claims of pretrial detainees provide the only clearly established law in 2018." *Id.* at 927–28. Second, for this case, any daylight between the tests for convicted prisoners and pretrial detainees is irrelevant because we resolve this case on the objective prong, which applies identically to both categories. *See Hehrer*, 161 F.4th at 963.

When determining whether a right is clearly established, the Supreme Court has emphasized "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[T]he clearly established law must be particularized to the facts of the case." *Id.* (citation modified). "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *al-Kidd*, 563 U.S. at 741). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To establish the objective component of a deliberate-indifference claim involving a medical condition, the medical condition must be serious. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2004). A plaintiff can demonstrate the "seriousness" of a medical need in two ways. First, he can show that the condition "has been diagnosed by a physician as

mandating treatment." *Id.* at 897 (citation modified). Or second, he can show that the condition "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation omitted); *see also Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014) ("[A] medical need is serious if the average person would surely deem it to be one that required professional treatment.").

This is not a situation in which a physician diagnosed a condition mandating treatment. *Blackmore*, 390 F.3d at 897. The doctors medically cleared Griswold for incarceration. So, to satisfy the objective prong, Griswold must show that it was clearly established at the time of the incident that the seriousness of his condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.*; *see also Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) ("The plaintiff bears the burden of showing that the right was clearly established.").

How does a plaintiff establish that he had a medical condition that obviously required medical attention? Unfortunately, our caselaw provides inconsistent answers. Some of our cases focus on the plaintiff's symptoms, "requir[ing] that the medical need be easily detectable by a layman from visual inspection." *Lumbard v. Lillywhite*, 815 F. App'x 826, 832 (6th Cir. 2020); *see also Blackmore*, 390 F.3d at 899 (concluding that the need for medical care was "obvious" because the plaintiff "exhibited obvious manifestations of pain and injury"). In others, however, "we have looked not to what was obviously detectable to the eye but instead to whether a layman, made aware of an individual's actual medical condition, would consider the condition to be obviously medically serious." *Lumbard*, 815 F. App'x at 832. "[T]hat is, even if the layman cannot see the medical need, if informed of the true medical situation, the layman would deem the need for medical attention clear." *Id.* Some panels of this court "have reasoned that the latter line of cases [is] on stronger ground, because relying on a test that turns on a layman's actual observation threatens to merge what is an objective test into the subjective component of deliberate indifference." *Id.* (citing *Gunther*, 561 F. App'x at 500).

Whatever the merits of the latter line of cases, both the district court and the parties have presented this case using the former approach. So, for the purposes of this appeal, we will too. To establish the objective prong, then, Griswold must show that he exhibited symptoms that

would make his need for medical care "obvious" to a layperson.  *See Blackmore*, 390 F.3d at 899.  He cannot make that showing.

Doctors medically cleared Griswold for incarceration prior to his placement in the jail cell.  The discharge paperwork stated, "[a]ltered mental state; [a]mphetamine user; [m]edical clearance for incarceration; nasal fracture" and instructed Griswold to return to the hospital for "[s]ignificant changes or worsening in [his] condition" or for "recurrent vomiting."  R. 53-11, Discharge Paperwork, PageID 867, 873–76.  During intake, Griswold needed assistance walking and refused to answer questions.  He appeared lethargic.  Once in the cell, he vomited one time, with some of the vomit landing on himself and the rest on the floor.  Griswold briefly cleaned his face and mouth but did not ask for assistance and remained sitting in his vomit for nearly 13 hours.  Beyond that, however, Griswold exhibited no signs of distress.  He largely remained in the same position, mostly seated against the wall, though he adjusted into a semi-lying position in the morning hours.  Throughout the night and morning, defendants conducted numerous cell checks.  Throughout the evening and morning, Griswold can be seen either moving his arms, legs, or head, occasionally readjusting his legs, folding or unfolding his arms, touching his face with his hands, or fixing his shirt.

The cases offered by Griswold and the district court would not have put every reasonable officer on notice that Griswold had an "obvious need for medical care."  *Blackmore*, 390 F.3d at 900.  Griswold offers only two cases in his brief on appeal.  In *Blackmore*, the prisoner (Blackmore) underwent an appendectomy.  *Id.* at 894.  Before he received care, Blackmore "exhibited obvious manifestations of pain and injury."  *Id.* at 899.  He "complained of 'sharp' and 'severe' stomach pains for an extended period of time."  *Id.*  He also "vomited—a clear manifestation of internal physical disorder."  *Id.*  He "complained orally and in writing for over two days before receiving medical treatment."  *Id.*  And jail officials "deemed Blackmore's condition sufficiently serious to place him in an observation cell."  *Id.*  Taking these factors together, we held that Blackmore exhibited a serious need for medical care that would have been obvious even to a lay person.  *Id.*

Like Blackmore, Griswold vomited.  But Griswold did not manifest other indicia that would have alerted jail officials that he had a serious need for medical attention.  Yes, Griswold

was lethargic and needed slight assistance when he arrived at the jail. But once in his cell, Griswold remained in a sitting position, showing no signs of distress beyond vomiting once. He did not writhe, groan, complain, or seek assistance. Any official monitoring the video would have seen Griswold from time to time moving his legs, arms, and head, sometimes shifting his body, and folding and unfolding his legs. Beyond the single incident of vomiting, to the viewer of the video, Griswold would appear to be sleeping or attempting to sleep on an uncomfortable prison floor. While we do not minimize Griswold's vomiting, or condone jail staff's failure to clean him up, this case is not like *Blackmore* in which there were multiple indications of a serious need for medical attention.

Griswold also relies on *Burwell v. City of Lansing*, 7 F.4th 456 (6th Cir. 2021). In *Burwell*, the plaintiff (Phillips) died of a drug overdose. *Id.* at 460. In concluding that Phillips had an "obvious need for medical care" and thus satisfied the objective prong, the court explained that "video evidence show[ed] Phillips in clear medical distress." *Id.* "For nearly 40 minutes, the video shows Phillips bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly." *Id.* He "ultimately fell to the ground where he lay motionless until officers attempted to revive him hours later." *Id.* "About 45 minutes after Phillips collapsed, a pool of vomit began to form around his head that grew over time." *Id.* In the end, Phillips lay "*unconscious* in that vomit for two hours without any apparent movement." *Id.* at 465.

Because the court released *Burwell* in 2021, it cannot clearly establish the law at the time of Griswold's death. *Lawler*, 93 F.4th at 927. But even if we were to consider *Burwell*, it is distinguishable. The plaintiff in *Burwell* clearly demonstrated signs of distress that would put a lay person on notice of his need for medical attention—clear signs of pain before falling to the ground and lying unconscious in a pool of vomit for two hours. Here, Griswold was not lying prone and unconscious in his vomit. And besides the single instance of vomiting, Griswold displayed no outward signs of distress and continually made minor movements throughout the duration of his stay in the cell that would suggest to jail officials that he was in no immediate need of medical attention. Accordingly, Griswold's need for medical attention was not "obvious," making this case distinguishable from *Burwell*.

The district court, for its part, cited *Preyor ex rel. Preyor v. City of Ferndale*, 248 F. App'x 636 (6th Cir. 2007). Unpublished opinions, however, cannot form the basis of a clearly established right. *Bell*, 37 F.4th at 367–68. In any event, the facts of *Preyor* are also quite different. There, "[o]n more than one occasion," the plaintiff vomited; "[o]n more than one occasion," the plaintiff "complained of and suffered bouts of diarrhea, eventually causing him to dehydrate"; and "[o]n more than one occasion," the plaintiff told officers "that he did not feel well and that he believed he was detoxing from heroin." *Preyor*, 248 F. App'x at 642. The officers were clearly on notice that the plaintiff in *Preyor* needed medical attention due to the multiple signs of distress. Griswold's lack of distress beyond the one instance of vomiting did not provide the officers in this case with any similar notice.

Griswold's death was tragic, made even more so by the fact that Griswold sat in his own vomit for hours. But it was not clearly established that the circumstances leading to his death satisfied the objective prong of the *Farmer* test. The jail officials therefore are entitled to qualified immunity. *Lawler*, 93 F.4th at 927.

\* \* \*

We REVERSE.