NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0275n.06

Case No. 26-3007

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

MICHAEL COLE, Administrator of the Estate of Deceased Branden Knight,

    Plaintiff-Appellant,

v.

ASHTABULA COUNTY, OHIO; ASHTABULA COUNTY SHERIFF'S DEPARTMENT; WILLIAM NIEMI, Sheriff; TAMMY ANTOUN, Jail Administrator; DALE LOCHER; MERISSA MOFFETT; BRIAN WHITNEY; COLE FARINA; MARK JACKSON; TARYN SIEMERS; JOHN DOES 1–3,

    Defendants-Appellees.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

FILED
Jun 26, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

</td></tr>
</table>

Before: BOGGS, KETHLEDGE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. While in custody at the Ashtabula County Jail, Branden Knight fatally overdosed on drugs that another inmate had brought into the facility. The administrator of Knight's estate then sued the County and various jail officials, claiming that they were deliberately indifferent to Knight's medical needs and failed to protect him from drugs in the jail. But the district court concluded that no constitutional violation had occurred, so it granted summary judgment to the defendants. Finding no error, we affirm.

I.

Branden Knight was awaiting trial on felony charges at the Ashtabula County Jail when he crossed paths with Benjamin Tressler.

Tressler arrived at the jail a few months after Knight. Ashtabula city police officers had learned that Tressler was about to engage in a drug deal and was carrying heroin. So they arrested him and alerted the Ashtabula County Sheriff's Department, which had outstanding warrants for his arrest. The city officers warned the Sheriff's Department that Tressler might have drugs concealed in his rectum. After a sheriff's deputy arrived to pick him up, the city officers discovered that Tressler had dropped a bag of drugs in the back of their cruiser. So they informed the deputy that Tressler had "got [the drugs] out." R. 25-9, Pg. ID 347.

Upon completing the handover, the deputy drove Tressler to the Ashtabula County Jail. There, he told jail officials that Tressler was suspected of carrying drugs but that some had already been recovered. Jail officials then patted Tressler down and strip-searched him. They didn't find any drugs. Because the police officers had already recovered drugs from Tressler, the jail officials didn't think there was probable cause to subject him to more intrusive searches. So they didn't search his body cavities.

Two days later, shortly after midnight, jail officers noticed that an inmate housed in Tressler's unit was behaving strangely. So they took the inmate out of the unit for observation and testing. Officers immediately concluded that he was under the influence of drugs. As a result, they reviewed security footage from the previous day to see if the inmate had used drugs in the jail. They didn't catch him using drugs, but they did observe other inmates behaving erratically. This prompted officers to take a group of inmates who were known drug users out of the unit for observation. That group included Branden Knight.

Officers then conducted a "shakedown" search of the unit. R. 25-4, Pg. ID 329. That "shakedown" involved checking all the areas where inmates could hide contraband, such as their personal belongings and the bathrooms. Officers didn't recover any drugs in either the common areas or in Knight's bunk area. But they did find a broken condom in Tressler's bunk area, which they suspected might have contained drugs.

Officers also strip-searched Knight and the other inmates. Again, they didn't discover any contraband.

Finally, officers drug tested Knight and the other inmates. Knight tested positive for heroin, synthetic cannabis, methadone, and tramadol. His test didn't reveal how long the drugs had been in his system or how much he had consumed. Knight then admitted to officers that he had used drugs the previous night. But he claimed he didn't have any drugs left.

During this entire process, Knight wasn't acting strangely or showing any signs that he was under the influence. In fact, officers took his vitals, and they were all normal. So officers returned Knight to his unit. Over the course of the night, they continued monitoring Knight using surveillance cameras. They also conducted several checks throughout the night, roughly every half hour to an hour. But they didn't notice "any suspicious activity" or see Knight "acting strangely." R. 25-3, Pg. ID 322. Instead, it appeared that he was "resting peacefully." R. 25-4, Pg. ID 331.

In the early morning, an officer was conducting a routine check and noticed that Knight had a "gray skin tone." *Id.* She called out his name, but Knight didn't respond. Another officer then checked for a pulse but couldn't find one. So they immediately called for paramedics. In the meantime, officers performed CPR, used a defibrillator, and administered Narcan, but none of those efforts succeeded. Soon after paramedics arrived, Knight was pronounced dead.

Following Knight's death, jail officials and the Sheriff's Department launched an investigation. They reviewed security footage, which revealed that Knight went into the bathroom for over 15 minutes, returned to his bunk, went back to the restroom a few minutes later, and then finally fell asleep. But the footage never showed him using drugs or suffering from an overdose. The Coroner's Office also conducted an autopsy and discovered that one of Knight's socks had a makeshift cloth pocket. Inside that pocket was a small bag containing heroin, tramadol, and fentanyl. The jail then determined that Knight had obtained those drugs from Tressler. Ultimately, the jail's internal investigation concluded that all staff had acted appropriately.

Michael Cole, the administrator of Knight's estate, sued Ashtabula County, the Sheriff's Department, the Sheriff, and various jail officials in Ohio state court under 42 U.S.C. § 1983. Cole alleged that the defendants violated Knight's constitutional rights because they were deliberately indifferent to his medical needs and failed to protect him from drugs in the prison and because the County failed to properly train its officers. Cole also filed claims under Ohio state law. The defendants then removed the case to federal court and moved for summary judgment. In a thoughtful and thorough opinion, the district court granted summary judgment. Cole timely appealed.

II.

We review a district court's grant of summary judgment de novo. In doing so, we view the facts in the light most favorable to the nonmoving party.

A.

Under the Fourteenth Amendment's Due Process Clause, pretrial detainees have the right to be free from deliberate indifference to their serious medical needs. *Griffith v. Franklin County*, 975 F.3d 554, 566 (6th Cir. 2020). Deliberate-indifference claims include both an objective and a

subjective component. *Id.* at 567. The former requires the detainee to establish that he had a "sufficiently serious medical need" such that the failure to provide medical care violated the Constitution. *Id.* But Cole can't prove that Knight had a sufficiently serious medical need. So his claim fails at the objective prong.

A medical condition satisfies the objective prong only if the pretrial detainee showed signs of a serious medical need. *Hodges v. Abram*, 138 F.4th 980, 990 (6th Cir. 2025). And a detainee shows signs of a serious medical need if either (1) a doctor diagnosed him as requiring treatment or (2) his condition was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith*, 975 F.3d at 567 (quotation omitted). A doctor never diagnosed Knight, so we focus on the second test.

Cole can't establish that Knight exhibited obvious signs of an overdose before his death. We've previously held that the objective prong wasn't met when the detainee "showed no symptoms of drug use, intoxication, overdose, or any other medical condition, and appeared to be in normal health." *Hodges*, 138 F.4th at 989. So too here. While Knight was held for observation for an hour, he didn't act strangely or even appear to be under the influence. Plus, his vital signs were all normal. Jail officers then observed him throughout the night, by both monitoring surveillance cameras and conducting regular checks. Knight didn't exhibit any signs of an overdose then, either. He simply appeared to be sleeping. So a lay person wouldn't have believed that Knight needed medical attention.

Even though Knight admitted to using drugs in the jail, that's also true for "the multitude of drug and alcohol abusers the jail admits." *Smith v. Pike County*, 338 F. App'x 481, 482 (6th Cir. 2009) (per curiam) (quotation omitted). And most of those users simply "sleep off their intoxication." *Id.* (cleaned up). So Knight's admitted drug use wouldn't have alerted a lay person

that he was at risk of overdosing. In fact, Knight stated that he hadn't used drugs since the previous evening and didn't have any drugs left.

Compare these facts with cases where we've found that a lay person would have realized the inmate was overdosing. In each of those cases, the detainee exhibited clear indications of distress, such as vomiting, slurred speech, or loss of consciousness.[1] Knight didn't exhibit any of those symptoms—or any other signs of an overdose. And that means it wouldn't have been obvious to a lay person that he needed medical attention.

In response, Cole argues that genuine disputes of material fact preclude us from finding that no constitutional violation occurred. Not so. First, Cole points to an affidavit from a jail officer who stated that she noticed "some erratic behavior" from Knight on the surveillance footage. R. 25-4, Pg. ID 329. But her affidavit makes clear that this "erratic behavior" occurred "the previous day." *Id.* The jail then responded to that "erratic behavior" by removing Knight from his cell for observation and drug testing. And the other officers consistently indicated that Knight wasn't behaving strangely and didn't appear intoxicated, either during the hour-long observation period or after being returned to his cell. What's more, erratic behavior on its own doesn't make it obvious that an inmate needs medical attention.

Second, Cole disputes whether the officers actually monitored Knight on the surveillance footage overnight. Although an officer swore that he "continued to monitor" Knight, Cole claims

---

[1] *See, e.g.*, *Grote v. Kenton County*, 85 F.4th 397, 407 (6th Cir. 2023) (finding objective prong met when inmate was "covered in sweat," "shaking so much [the nurse] could not take all of his vital signs," "was hyperventilating[,] and could only lie down"); *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 836 (6th Cir. 2011) (same when inmate was "visibly intoxicated, his eyes were glazed, his speech was slurred, . . . his coordination and balance were compromised," and he "had difficulty keeping his head up and maintaining consciousness"); *Bertl v. City of Westland*, 2009 WL 247907, at *5–6 (6th Cir. Feb. 2, 2009) (same when inmate was "lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms"); *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (same when inmate exhibited signs of heroin withdrawal, vomited, suffered from "bouts of diarrhea," and "was seen lying on the floor of a cell").

that the officer later testified that he didn't know who was watching the cameras. *Compare* R. 25-7, Pg. ID 342, *with* R. 28-6, Pg. ID 625. But the officer testified that he was personally watching the surveillance footage that evening. He simply couldn't remember whether anybody else was watching the monitors too. And even if we accepted that officers weren't monitoring the surveillance cameras, Cole still hasn't identified any evidence that Knight showed clear symptoms of a sufficiently serious medical need. Rather, the evidence points in the opposite direction because officers didn't notice any problems during their routine cell checks.

Third, Cole contests whether officers took Knight's vital signs on the night he passed away. He emphasizes that jail policy required them to call a nurse and fill out an emergency-response form after taking an inmate's vitals, yet they didn't do so here. But the mere failure to follow jail policy doesn't amount to deliberate indifference. *Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018). And even if the officers' failure to follow jail policy casts doubt on whether they took Knight's vitals, that still wouldn't change our analysis. Cole bears the burden of proving that Knight exhibited obvious signs of medical distress, and he has presented no such evidence.

Finally, Cole hangs his hat on testimony from the jail administrator who conducted the investigation into Knight's death. According to Cole, the administrator "admitted that being under the influence of drugs was *a medical emergency* that required that a squad be called." Appellant's Br. at 23. But the administrator said no such thing. The administrator simply testified that if a detainee "appears to be in distress," "is not coherent," is "highly intoxicated," or is "having trouble breathing," then jail policy requires calling a medical squad. R. 28-5, Pg. ID 552–53. Because Knight didn't exhibit any of those symptoms, the administrator's testimony isn't relevant here. Cole also emphasizes the administrator's statement that Knight's trips to the bathroom should have raised "a flag that something was going on." *Id.* at 566. But the question isn't whether "something

was going on." It's whether Knight showed indications of a medical issue that were so obvious that a lay person would have recognized that Knight needed a doctor's attention. And two trips to the bathroom alone aren't enough.

Because Cole presents no evidence that Knight exhibited clear signs of medical distress, the defendants are entitled to summary judgment on this claim.

B.

Cole also raises a failure-to-protect claim. That requires him to show that Knight was held "under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Cole alleges that Knight faced a substantial risk of overdosing on drugs that he obtained from another inmate (Tressler).

A plaintiff raising a failure-to-protect claim premised on a drug overdose faces an uphill battle. That's because "simple exposure to drugs" doesn't suffice. *Zakora v. Chrisman*, 44 F.4th 452, 472 (6th Cir. 2022). Rather, the plaintiff must show that there was "unfettered access to deadly drugs" in the jail. *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 684 (6th Cir. 2024). And that condition is satisfied if there was a "widespread presence of drugs at [the] facility," there were recent prior overdoses, and jail officials failed to investigate the overdoses. *Id.* (cleaned up). None of those conditions is present here.

For starters, Cole hasn't presented any evidence that drugs were widespread at the Ashtabula County Jail. To the contrary, officers testified that inmates were "almost always" prevented from bringing drugs into the prison through pat downs and strip searches at booking. R. 25-2, Pg. ID 314. So "very few inmates ever [got] contraband" into the jail, and a male inmate had "never" done so before Tressler did. R. 25-4, Pg. ID 331.

Nor has Cole identified any evidence of recent overdose deaths and a failure to investigate those deaths. In fact, Knight's overdose was the only one that jail officials could recall from the past 20 years.

In response, Cole again claims that genuine disputes of material fact preclude us from finding that no constitutional violation occurred. Specifically, he focuses on whether jail officials knew that Tressler might still be concealing drugs in his rectum, whether they should have taken Tressler to the hospital for a rectal exam, and whether officers properly strip-searched Knight. But even if those disputes exist, they aren't material. That's because one instance of drugs slipping into the jail isn't enough to establish a "widespread presence of drugs," which is the key question.

Cole also emphasizes an officer's deposition testimony that "a lot of drugs were found" by having inmates suspected of carrying contraband in their rectums "squat and cough." R. 28-2, Pg. ID 465. But this testimony undermines Cole's claim because it demonstrates that jail officials often caught drugs before they entered the facility. And that suggests drugs weren't widespread at the Ashtabula County Jail.

In short, because Cole hasn't established that there was unfettered access to drugs at the jail, the defendants are entitled to summary judgment on Cole's failure-to-protect claim.

C.

Cole also sued the County for failing to properly train and supervise its officers. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). But a government agency can't be liable under *Monell* if there's no underlying constitutional violation. *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Because Cole hasn't proven that Knight's constitutional rights were violated, the district court properly granted summary judgment to the County on his *Monell* claim.

D.

Finally, Cole alleges that the defendants violated Ohio law. But the district court concluded that the defendants were entitled to immunity on these claims. We agree.

When a plaintiff's claims under Ohio law and federal law depend on the same questions of material fact, officers are entitled to state-law immunity if qualified immunity shields them from liability on the federal deliberate-indifference claims. *See Downard ex rel. Est. of Downard v. Martin*, 968 F.3d 594, 602–03 (6th Cir. 2020). And officers are entitled to qualified immunity under federal law if their conduct didn't violate any constitutional rights. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam).

Here, the defendants didn't violate Knight's constitutional rights, so qualified immunity bars the federal claims against them. *See id.* As Cole admits, these federal claims depend on the same questions of material fact as his state-law claims. That means the defendants are entitled to immunity under Ohio law, so the district court properly dismissed Cole's state-law claims.

\* \* \*

We affirm.